*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SERVO KINETICS, INC.,

    *Plaintiff-Appellant,*

  *v.*

TOKYO PRECISION INSTRUMENTS CO. LTD.; MOOG, INC.,

    *Defendants-Appellees.*

No. 05-2741

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-73360—Avern Cohn, District Judge.

Argued: November 1, 2006

Decided and Filed: January 30, 2007

Before: CLAY and SUTTON, Circuit Judges; SHARP, District Judge.[*]

---

## COUNSEL

**ARGUED:** Allyn D. Kantor, MILLER, CANFIELD, PADDOCK & STONE, Ann Arbor, Michigan, for Appellant. Kevin M. Kearney, HODGSON RUSS LLP, Buffalo, New York, for Appellees. **ON BRIEF:** Allyn D. Kantor, Mark T. Boonstra, Marta A. Manildi, MILLER, CANFIELD, PADDOCK & STONE, Ann Arbor, Michigan, for Appellant. Kevin M. Kearney, HODGSON RUSS LLP, Buffalo, New York, Edward H. Pappas, DICKINSON WRIGHT, PLLC, Bloomfield Hills, Michigan, Brian M. Akkashian, DICKINSON WRIGHT, PLLC, Detroit, Michigan, for Appellees.

  CLAY, J., delivered the opinion of the court, in which SHARP, D. J., joined. SUTTON, J. (pp. 17-19), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

  CLAY, Circuit Judge. Plaintiff Servo Kinetics, Inc. ("SKI") appeals the district court's grant of summary judgment in favor of defendants, Tokyo Precision Instruments Co. Ltd., ("TSS") and

---

[*] The Honorable Allen Sharp, United States District Judge for the Northern District of Indiana, sitting by designation.

its parent, Moog, Inc. ("Moog").[1]  On appeal, SKI argues that (1) TSS breached its contract with SKI; (2) Moog is liable for TSS's breach of contract under a veil-piercing theory; and (3) Moog is liable for tortious interference with the contract between TSS and SKI.  SKI also argues that the district court improperly denied partial summary judgment in its favor on the liability issue of the same claims. The contract at issue established an exclusive distribution agreement between TSS and SKI for a period of five years, whereby SKI would distribute servo valves manufactured by TSS. This is an action in diversity.  The breach of contract claim is governed by Japanese law; the other claims are governed by Michigan law.  Applying such law, we **REVERSE** the district court's grant of summary judgment in favor of TSS on the issue of breach of contract and **REVERSE** summary judgment in favor of Moog on the issue of veil-piercing liability.  We **AFFIRM** the district court's grant of summary judgment in favor of Moog on the tortious inference with contract claim, and **AFFIRM** the district court's denial of summary judgment in favor of SKI on all its claims.

## I.

This case involves Moog's acquisition of TSS, which had a contractual relationship with SKI.  All three companies were involved in the business of servo valves.  A servo valve is an electro-hydraulically controlled mechanism used in such products as flight simulators.  Prior to changes instituted at TSS as a result of Moog's acquisition, TSS manufactured servo valves.  SKI repairs and rebuilds servo valves, and distributes servo valves in North America, frequently under its own name, but does not produce servo valves.  TSS and SKI had engaged in a business relationship since 1990, whereby SKI distributed TSS servo valves in North America.  According to SKI, SKI never dealt with another servo valve manufacturer.

Moog also manufactures servo valves.  Moog is a large international distributor of servo valves, operating in multiple regions of the world, including North America, through its subsidiaries.  Prior to Moog's acquisition of TSS, Moog servo valves were a substitute for TSS servo valves, and the companies competed for customers.

Sometime in 2000, Moog began to consider acquiring a controlling interest in TSS.  While doing its due diligence in November of 2001, Moog learned that SKI was TSS's largest foreign customer, with an agreement for SKI to distribute TSS servo valves in North America.  At the time, TSS and SKI operated under agreements lasting one year, which were renewed automatically unless the other party gave notice to the contrary.

In January of 2002, under the specter of Moog buying TSS, SKI and TSS sought to execute an agreement that would last for a longer duration (hereinafter the "Agreement").  The Agreement was dated February 8, 2002,[2] and provided that TSS and SKI agreed that SKI would be the exclusive distributor of TSS servo valves in North and South America for a five-year period, with an automatic renewal for an additional year unless either party gave written notice to the contrary.  As relevant to this appeal, the Agreement additionally contained the following terms:

---

[1]Moog, Inc is the parent of a wholly-owned subsidiary, Moog Japan.  Moog Japan, which is incorporated in Japan, acquired and currently owns a majority interest in TSS stock.  For convenience, Moog, Inc. and Moog Japan are collectively referred to as "Moog," except to the extent that the distinction is significant.

[2]Moog alleges that the Agreement has been backdated to February 8, 2002, and that it was not truly executed until later in February of 2002.  It is, however, undisputed that Moog had knowledge of the Agreement before it agreed to acquire TSS.

ARTICLE 16.  GOVERNING LAW

This Agreement shall be governed by and construed with the laws of Japan.

ARTICLE 19.  TERM

(1) This Agreement shall become effective on the date first above written and shall continue in full force and effect for a period of five (5) year.  [sic]  This Agreement may be renewed for a further period of one (1) year unless either party hereto gives written notice of its intention not to renew this Agreement to the other party not later than six (6) month [sic] prior to the expiration of this Agreement or any renewal thereof.

(2) During the term of this Agreement each party may terminate this Agreement by giving six (6) month [sic] prior written notice to the other party, provided however, such right of termination shall not be exercised without good reason.

J.A. at 280-81.

On February 28, 2002, Moog signed an agreement to purchase TSS by acquiring TSS stock. The deal closed on March 29, 2002.  By the spring of 2002, Moog owned 98% of TSS shares.  On March 30, 2002, there was a shareholders meeting where Moog employees replaced TSS's resigning directors as the new directors of TSS.

On April 8, 2002, TSS sent a letter to SKI providing notice that it was terminating the Agreement with SKI in six months, which TSS interpreted as being in accordance with Article 19 of the Agreement.  The letter stated:

There has been a change in ownership of TSS and a change in management.  As you will be aware by now, Moog-Japan acquired a controlling interest in TSS on 1st April, 2002.  The TSS/SKI Exclusive Distributor Agreement dated January 1, 2002 would place in serious conflict and disarray the product distribution arrangements around the world of TSS and Moog and all Moog subsidiaries, including Moog-Japan.

J.A. at 389.

The relationship between TSS and SKI deteriorated in the period following TSS's  notice that it was terminating the Agreement.  SKI met with TSS on May 2, 2002, to discuss potential cooperative strategies for the future, but the meeting was not fruitful.  Shortly thereafter, a dispute arose over a "ball welding" machine.  The machine, which would have provided SKI with some degree of manufacturing capacity for TSS valves, was scheduled to be delivered on April 22, 2002. The delivery date was subsequently delayed until May 10, 2002.  On May 8, 2002, SKI informed TSS that it would withhold all payments until the machine was delivered.  TSS did not ship the ball welding machine by May 10, 2002, instead informing SKI that it needed more time for the assembly and testing of certain parts.  On June 5, 2002, SKI cancelled its order for the ball welding machine, stating that it had ordered a comparable machine from a supplier from whom delivery could be assured.  Problems also arose because of money that SKI owed to TSS.  SKI was in arrears to TSS, owing over $250,000, and was over sixty days behind on $100,000 of the amount owed.  Starting in the summer of 2002, due to the increasingly antagonistic relationship between SKI and TSS, TSS refused to ship or accept new orders from SKI until the arrearages were satisfied.  On June 26, 2002, TSS informed SKI that it would not be accepting any new orders after the end of that month.  In June and July of 2002, SKI cancelled large orders of servo valves from TSS.

Throughout the spring and summer of 2002, Moog made drastic changes to TSS. These changes amounted to shutting down TSS's operations as an independent entity, integrating some components of TSS's business into Moog's, and selling the other components. Moog sold the TSS facility in September of 2002. Moog also transferred TSS's customers to Moog during the spring and summer of 2002. Certain TSS employees were hired as Moog employees; however, the majority of TSS employees were laid off when the TSS facility closed in September. Moog also shifted the manufacturing of some, but not all, of TSS's products to Moog facilities. Furthermore, TSS cancelled all of its foreign distribution agreements. The parties dispute Moog's motivation for the drastic changes at TSS. SKI asserts that Moog had planned to dismantle TSS's operations since before the acquisition of TSS. Moog claims that, after Moog acquired TSS, it learned that TSS was in worse financial condition than expected due to fraudulent accounting practices, and this new information caused TSS's new management to decide to undertake this course of action.

According to SKI, the changes precipitated by Moog's acquisition of TSS have been damaging to SKI's business. SKI alleges that, although it made efforts to find an alternative source of supply of servo valves, no other company could meet its demands. SKI asserts that other companies have different products, in terms of design, function, and quality, and that no other product could be taken to SKI's customers or potential customers successfully. SKI estimates that developing manufacturing capacity for servo valves would be expensive and time-consuming, taking up to five years. Operating under its relationship with TSS, SKI sold servo valves under its own name, and had input into the quality and design of the servo valves, as well as favorable pricing deals which allowed it to price its servo valves competitively. Thus, SKI offered its customers a package that included both the servo valves and the service on those servo valves. SKI claims that it cannot replicate this relationship with other producers. Moreover, SKI alleges that it has lost customers on account of the fact that it can no longer offer TSS servo valves.

On August 4, 2003, SKI filed suit against Moog and TSS (collectively "Defendants") alleging breach of contract against TSS, breach of contract against Moog, tortious interference with contract against Moog, and violations of the Michigan Trade Secrets Act.[3] Moog removed the action to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1441.[4] On November 22, 2004, Defendants filed a motion for summary judgment, and SKI filed a motion for partial summary judgment on the issue of Defendants' liability. The parties agreed that, pursuant to the contract, Japanese law governed SKI's breach of contract claim. After holding a hearing on the parties' motions on February 16, 2005, the district court held its decision in abeyance and appointed Professor John Haley as a Japanese law expert pursuant to Fed. R. Evid. 706. Professor Haley reported his legal conclusions to the district court on April 29, 2005, and the parties filed supplemental papers in light of Professor Haley's opinion.[5] On November 22, 2005, the district court issued an order denying SKI's motion for partial summary judgment, granting Defendants' motion for summary judgment, and dismissing the case. SKI filed a timely notice of appeal on December 20, 2005.

---

[3]The alleged violation of the Michigan Trade Secrets Act is not an issue raised on this appeal.

[4]The district court properly invoked diversity jurisdiction. *See* 28 U.S.C. § 1332(a). SKI is a Michigan corporation with its principal place of business in Michigan. Moog is a New York corporation with its principal place of business in New York. TSS is a Japanese corporation with its principal place of business in Japan.

[5]Defendants filed an amended motion for summary judgment on June 13, 2005; SKI filed an amended motion for partial summary judgment on July 6, 2005.

**II.**

**A.     STANDARD OF REVIEW**

This Court reviews the district court's grant of summary judgment *de novo*. *Gage Prods. Co. v. Henkel Corp*, 393 F.3d 629, 637 (6th Cir. 2004) (citing *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001)). Interpretations of foreign law present a question of law, to which *de novo* review applies. *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999) (citing Fed. R. Civ. P. 44.1). "Summary judgment must be granted if the pleadings and evidence 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Gage Prods. Co.*, 393 F.3d at 637 (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if a reasonable jury could find for the nonmoving party on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a reasonable jury could find for the nonmoving party, this Court views all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.     BREACH OF CONTRACT**

Whether TSS could terminate the Agreement is determined by Japanese law. The provision of the Agreement governing termination provides that:

> (2) During the term of this Agreement each party may terminate this Agreement by giving six (6) month [sic] prior written notice to the other party, provided however, such right of termination shall not be exercised without *good reason*.

J.A. at 281 (emphasis added). Thus, our task is to determine what constitutes "good reason" under Japanese law. The starting point for this analysis is the legal report of Professor Haley, who was appointed by the district court as an expert pursuant to Federal Rule of Evidence 706. The district court specifically posed three questions to Professor Haley. First, the court asked what constitutes "good reason" under Japanese law. Second, the court asked about issues concerning the timing of the notice to terminate a contract. Third, the district court asked whether the form of the notice to terminate a contract has any bearing on the validity of the termination. In response to these inquiries, Professor Haley stated the following conclusions:

> [W]hether, under the circumstances described above with respect to the TSS/SKI dispute, a manufacturer or seller has "good reason" to terminate a distribution agreement of definite duration (stated term) with six months formal notice as expressly agreed depends under Japanese law, in my opinion, on the answers to two questions of fact: (1) whether the manufacturer/seller had commercially legitimate motives for termination and (2) whether more than six months notice would have been necessary for the distributor/buyer to make necessary commercial adjustments, including recovery for investment made in reasonable anticipation that the exclusive distributorship would continue for at least the stated term. The form of notice has no apparent bearing on the right to terminate.
>
> I am not aware of any Japanese case in which intermediate termination–that is, termination before the expiration of the stated term–of an exclusive distribution contract by the manufacturer/seller was either the consequence or expressly justified on the basis of acquisition by a competitor with a separate distribution network. To the extent, however, that the termination was in fact motivated by legitimate commercial concerns resulting from such acquisition, in my opinion, a Japanese

court would consider the manufacturer/seller to have "good reason" for intermediate termination so long as adequate notice, as noted, was given.

J.A. at 819-20.

With this framework in mind, we turn to the two questions of fact outlined by Professor Haley, with one caveat. Japan does not use juries in its civil system, and Japanese courts do not distinguish between questions of fact and questions of law. J.A. at 823. Summary judgment requires the court to view the facts, as they exist in the record, in the light most favorable to the nonmoving party in making the determination of whether the nonmoving party could prevail on its claim.[6] This, of course, requires that the court separate questions of law from questions of fact. Imposing this necessary distinction of American procedure upon Japanese jurisprudence is necessary, even if somewhat forced or artificial.

### 1. Whether TSS had commercially legitimate motives

Professor Haley's opinion makes clear that, in determining whether a reason was commercially legitimate, the court focuses on the *motive* for termination. The parties disagree about two issues related to this inquiry. First, the parties disagree about how the court should determine TSS's motivation. Second, the parties dispute what factually motivated TSS to terminate its agreement with SKI.

The district court concluded that, in determining what motivated TSS, the court should look to the totality of the circumstances. Analyzing the case in the context of the totality of the circumstances, the district court concluded that TSS did have a commercially legitimate motive for terminating the Agreement. The district court noted that TSS was in a poor financial condition, that SKI owed TSS money, and that TSS had decided to shut down its operations and eliminate foreign distribution agreements. These circumstances, as well as the fact that the Agreement was executed in the context of rumors of a Moog acquisition of TSS, sufficed for the district court to conclude that TSS acted with a commercially legitimate motive.

We conclude that the district court erred in this analysis. While the district court correctly determined that it should look to the totality of the facts and circumstances in determining TSS's motive, its analysis replaced the inquiry into TSS's actual motive with the question of whether, objectively considering the facts and circumstances, TSS *could* have had a legitimate motive. In our opinion, the inquiry is a subjective one, which seeks to determine the reason why TSS made its decision to terminate the Agreement. We base this holding on several grounds. First, Professor Haley's opinion suggests that the inquiry is subjective. In discussing what constitutes a commercially legitimate motive, Professor Haley states that "[t]o the extent . . . that the termination *was in fact* motivated by legitimate commercial concerns . . . a Japanese court would consider the manufacturer/seller to have 'good reason' for intermediate termination." J.A. at 820 (emphasis added). Moreover, the word "motive," defined as "something within a person . . . that incites him to action," or "the consideration or object influencing a choice or prompting an action," suggests an inquiry into the actual facts driving TSS's actions. Webster's Third New International Dictionary 1475 (1993) ("motive" definition 1a and b). Asking whether the facts and circumstances objectively presented a legitimate motive, as opposed to what factually motivated the parties, would also be inconsistent with principles of Japanese law. Article 1 of the Japanese Civil Code sets out the concepts of good faith and abuse of rights. Section 2 of Article 1 states that "[t]he exercise of rights

---

[6]Summary judgment is a procedural rule, and therefore the Federal Rules of Civil Procedure govern summary judgment standards. *See Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165-66 (6th Cir. 1993).

and performance of duties shall be done in faith and in accordance with the principles of trust." Willem M. Visser 't Hooft, *Japanese Contract and Anti-Trust Law: A Sociological and Comparative Study* 23 (2002) (attached as an addendum to Professor Haley's opinion). Section 3 of Article 1 states that "[n]o abusing of rights is permissible." *Id.* The Japanese notions of trust and good faith, mandated by the legal system, are at least inconsistent, if not incompatible, with a legal system that only examines the objective circumstances surrounding the parties' actions. *See id.* at 37 ("The determining factor in many [contract termination] decisions is whether 'unavoidable reasons' exist for the termination, a concept which can be accommodated within the general Civil Code principle of good faith. This concept remains fairly vague, but it enables the courts to also take the parties' subjective circumstances into account.").

Viewing the facts in the light most favorable to SKI, as we must for purposes of summary judgment, SKI has presented sufficient facts from which a reasonable jury could conclude that TSS's actual, subjective motivation in breaching its contract was to gain a competitive advantage over SKI. On April 8, 2002, SKI received a letter terminating the TSS/SKI contract in six months. The only explanation for the termination stated in the letter reads as follows:

> There has been a change in ownership of TSS and a change in management. As you will be aware by now, Moog-Japan acquired a controlling interest in TSS on 1st April, 2002. The TSS/SKI Exclusive Distributor Agreement dated January 1, 2002 would place in serious conflict and disarray the product distribution arrangements around the world of TSS and Moog and all Moog subsidiaries, including Moog-Japan.

J.A. at 389. The letter was signed by Sean Gartland, President and Representative Director of Moog Japan and Director of all Pacific subsidiaries of Moog. In his deposition, Mr. Gartland elaborated on the April 8 letter as follows:

> Q. If that agreement were terminated justifiably, it perhaps might expire. Is that your position?
>
>  . . .
>
> A. The agreement was terminated justifiably.
>
> . . .
>
> Q. And the basis for your conclusion, sir, that it was terminated justifiably is what, sir?
>
> A. The basis that was given in the letter of the 8th of April.
>
> Q. Is that the only basis?
>
> A. That is the basis.
>
> Q. The only one?
>
> A. Yes.
>
> . . .
>
> Q. And what product distribution arrangements are you referring to in that letter?

A.  In the Moog organization around the world there are areas of responsibility for the distribution of product.

Q.  Right and the arrangements would be arrangements with exclusive distributors?

A.  No, within the Moog Organization.

Q.  Distributors within the Moog organization?

A.  Moog Japan does not sell to customers outside of Japan.

. . .

A.  A Moog organization does not sell to an external customer in a territory where there's another Moog company.

J.A. at 453-54.  From this evidence, a jury could infer that the reason that TSS ceased to sell servo valves to SKI was because Moog did not wish for SKI to attempt to resell those servo valves to the same customers to whom Moog hoped to sell servo valves.

SKI also presented evidence that calls into question TSS's explanations for its business practices.  SKI's evidence casts doubt on TSS's claim that it chose to close its operations due to the deteriorating financial position of TSS.  A February 5, 2002, Board of Directors Resolution entitled "Action 02-11 Acquisition of Tokyo Precision Instruments Co., Ltd." states that "[Moog] management was requesting authority for approximately $8.5 million, with the understanding that the building would be sold at the earliest convenience at an anticipated recovery of $800,000." J.A. at 689.  SKI also presented evidence suggesting that Moog's decision to terminate TSS's relationship with SKI occurred before TSS was acquired.  Specifically, at his deposition, Gartland stated:

Q.  When did you make the decision that pursuing the business with SKI was not going to be practical?

A.  For any of the distributors of TSS outside of Japan, it was not going to be practical for a Japan organization to continue doing that connection.

Q.  But that was a conclusion that you arrived at months before the January, '02 time frame, right?

A.  Yes.

J.A. at 910.

Circumstantial evidence also suggests that Moog was concerned with competition from SKI. An email from Bruce Coons, a Moog employee, states that "[SKI] is becoming a serious burr. . . . I do not have many ideas to thwart SKI's business strategy."  Email from Bruce Coons to Dennis Boon and Paul Elwell, Director of Business Development for Moog Inc.'s Industrial Controls Division (May 18, 2001) (J.A. at 272).  A note from Moog's vice president on March 15, 2002, two weeks prior to Moog's closing on the TSS acquisition, asks the recipient to "organize a fast review of the Dist Agreement for [SKI].  We need to put together a battle plan."  Note from Martin Berardi, Moog Inc.'s Vice President, to Paul Elwell, Director of Business Development for Moog Inc.'s Industrial Controls Division (March 15, 2002) (J.A. at 987).

From the sum of this evidence, we conclude that a reasonable jury could find that TSS was not in fact motivated by the reasons that it stated in connection with this litigation, i.e., SKI's late-payment history, TSS's worse-than-expected financial condition, and the "conflict and disarray" that would be caused by selling from a Japanese supplier to a North American customer. Instead, a jury could conclude from this evidence that the Agreement was terminated for the purpose of benefitting Moog by depriving its competitor of its sole source of supply. The question then becomes whether this purpose constitutes a "commercially legitimate motive" under Japanese law.

Professor Haley provided the following guidance in his opinion to the district court:

> The commercial reasons for termination and economic consequences on a dependant party are critical factors. Two categories of conduct the part of the party subject to termination are especially apt to justify unilateral termination. The first encompasses acts on the party of the part [sic] being terminated that are inconsistent with "mutual trust" and fair commercial dealings, particularly a breach of contract. The second includes conduct that increases the commercial risks of the party seeking to end the relationship, such as failure to make timely payments. The motives of the party seeking to terminate the relationship also have significant bearing. Absent a dependency relationship, the courts generally uphold termination motivated by legitimate commercial concerns. Examples [sic] illegitimate commercial concerns that failed to justify unilateral termination would include sellers' enforcing illegal resale price maintenance, or attempting to take advantage of distribution networks developed by long-term distributors. Unilateral termination is thus more difficult to justify to the extent that the party being terminated is unable to recover investments made with the expectation of continuation of the business relationship or is economically dependent on the commercial relationship.

J.A. at 821 (citations omitted).

Professor Haley's opinion, along with a review of other sources of Japanese law, suggests the following framework. First, the court should determine whether or not the party being terminated was economically dependent on the terminating party. If so, as Professor Haley's opinion makes clear, termination is more difficult to justify, and the reasons for the termination must be more compelling. *See also* John Owen Haley, *The Spirit of Japanese Law* 154 (1998) (in the context of terminating a repeated-dealing contract "courts at least implicitly stress the degree of dependency that the conduct of the terminating party has fostered as evidenced by the other party's reliance on the continuation of the relationship in the form of investment in the enterprise or opportunities foregone"); *cf.* Visser 't Hooft, *supra*, at 27 ("Requiring the terminating party to point to an unavoidable reason for doing so allows the court to examine the actual nature of the parties' relationship and evaluate the impact of the cancellation for the distributor. In this way the Japanese courts tend to protect the interests of distributors for whom the ill effects of the cancellation can be very injurious."). If an economic dependency relationship between the parties does not exist, termination is easier to justify, although the reason must still amount to a commercially legitimate reason. *See* Declaration of Hiroshi Kondo, Attorney and Law Partner, Tokyo Aoyama Aoki Law Office and Baker & McKenzie Law Offices,[7] J.A. at 704 ("If 'compelling reasons' exist . . . Japanese law allows the party to terminate the contract regardless of 'mutual trust' or any contractual arrangements between the parties. . . . [E]ven if 'compelling reasons' do not exist, a court may find that TSS still had 'reasonable commercial reasons' if the 'mutual trust' of the parties was not violated."). Moreover, the question of dependency or nondependency is not a rigid categorical

---

[7]Mr. Kondo was retained by Defendants as a Japanese law expert and submitted his declaration on their behalf.

determination, but a factor to be balanced against the reason for the termination, judged in light of the facts and circumstances of each case.

A reasonable jury could find a high degree of dependency on the part of SKI. SKI alleges that, despite a diligent search, it could not find a comparable alternative source of servo valves. Replacing TSS as a supplier has been difficult because the market is highly concentrated and the other companies that do manufacture servo valves offer a very different product in terms of design, function, and quality. Alternatively, for SKI to develop its own manufacturing capacity would be expensive and time-consuming. SKI also claims that its relationship with TSS was not that of a mere distributor; instead, SKI had built its business around its relationship with TSS. Specifically, SKI had centered its business around TSS servo valves by selling those valves under its own name, and by having input into design and quality-control issues. Furthermore, SKI had obtained favorable pricing arrangements from TSS that it could not replicate with other servo-valve suppliers. SKI also asserts that it had undertaken investments in reliance on its ongoing relationship with TSS, by, for example, building a business reputation as a servo-valve supplier. Finally, SKI claims that it has lost customers because of its inability to offer TSS servo valves. These facts, if credited by a jury, would suffice to support a finding that SKI was dependent to a large degree on TSS.

The dissent ignores these facts which suggest that SKI is economically dependent on TSS, and instead concludes that "SKI cannot point to any reliance interests established between the date of the contract and its termination." Dis. Op. at 18. This conclusion follows from an erroneous application of Japanese law. Where a supplier and distributor enter into a contract for a fixed term after a business relationship that spans fifteen years, a Japanese court, when considering whether the distributor subject to termination is economically dependent on the supplier, would look to the entire relationship between the parties, and not merely limit its inquiry to the time between the execution of the most recent contract and the date of termination. *See* Opinion of Professor John O. Haley, (Apr. 29, 2005) (J.A. at 821) ("Unilateral termination is thus more difficult to justify to the extent that the party being terminated is unable to recover investments made with the expectation of continuation of *the business relationship* or is economically dependent on the *commercial relationship*." (emphasis added)). When the relationship as a whole is considered, the facts adduced by SKI, which must be accepted as true for summary judgment, suggest that it was highly dependent on TSS.

Given a highly dependent relationship between SKI and TSS, a contractual termination motivated by a desire on the part of TSS to suppress competition from SKI would not constitute "good reason." Professor Haley states that "[t]wo categories of conduct the part of the party subject to termination are especially apt to justify unilateral termination. The first encompasses acts on the party of the part being terminated that are inconsistent with 'mutual trust' and fair commercial dealings, particularly a breach of contract. The second includes conduct that increases the commercial risks of the party seeking to end the relationship, such as failure to make timely payments." J.A. at 821 (citations omitted). *Accord* Visser 't Hooft, *supra*, at 37 ("In case law . . . unavoidable reasons are often derived from a serious breach of contractual obligations, the breakdown of the parties' trust relationship, anxiety concerning the other parties' reliability or a change in circumstances."). Neither of these categories bear a similarity to termination for the purpose of harming one's competitor.

We also conclude that, even in the absence of a highly dependent relationship, a motive of harming one's competitor could still constitute a commercially illegitimate motive. As examples of illegitimate motives, Professor Haley lists "sellers' enforcing illegal resale price maintenance" and sellers' "attempting to take advantage of distribution networks developed by long-term distributors." J.A. at 821. These reasons share the common theme of being anticompetitive or opportunistic. The motive of harming competitors by eliminating their source of supply is of a

similar ilk. Thus, were a jury to credit SKI's evidence on TSS's motive, it could find that TSS's termination of the Agreement was not undertaken for commercially legitimate motives.

The dissent, in concluding that TSS did have legitimate commercial motives, asks, "Is it not the case that one profit-driven company may purchase another profit-driven company for the purpose of expanding profits–even if that means that a third profit-driven company bears the risk of losing profits?" Dis. Op. at 18. This rhetorical slight-of-hand fails to address the real issue in this case–after all, this litigation does not challenge Moog's ability to purchase TSS. Instead, the question presented by this litigation is whether one company may terminate a distribution agreement with a dependent company with which it has a fifteen-year commercial relationship for the purpose of benefitting the first company's shareholders at the expense of the second company. Japanese law answers this question in the negative. Moreover, the conclusion that this motive is not commercially legitimate is independent of the question of whether Moog's conduct violates Japanese Antimonopoly Law. *See* Dis. Op. at 18 ("Had the purpose of this takeover been to create an illegitimate monopoly, that would be . . . a commercially illegitimate, and thus impermissible, ground for the termination."). As the cases summarized by Professor Haley make clear, Japanese law does not require a finding that a business practice violates Antimonopoly Law as a precondition for the practice to fail as a justification for terminating a contract. *See K.K. Ferox v. K.K. Aloins Cosmetics*, *Hanrei Jiho* (No. 1612) 62 (Osaka High Ct., Mar. 28, 1997) (summarized at J.A. at 826).

## 2.  Whether more than six months notice was necessary

The second question of fact posited by Professor Haley is "whether more than six months notice would have been necessary for the distributor/buyer to make necessary commercial adjustments, including recovery for investment made in reasonable anticipation that the exclusive distributorship would continue for at least the stated term." J.A. at 820. Whether or not six months notice was adequate is a close question. Professor Haley's report states that "[a]bsent exceptional circumstances . . . six months notice has usually been deemed adequate." J.A. at 821. Moreover, Professor Haley asserts that "[a] careful examination of the remedies in the cases in which unilateral termination was not upheld suggests . . . that six months to one year's notice would have been adequate in that the relief has usually been limited to an injunction to fill pending orders at the time of termination or up to a year's lost profits." J.A. at 822 (citations omitted). Nevertheless, we are persuaded that SKI has put forth enough evidence to survive summary judgment.

We reiterate that the adequacy of the notice is a question of fact. In conducting this analysis, it is appropriate to consider not just the parties' conduct under the present contract, but to additionally consider the parties' relationship, which in this case extends back to 1990. *Cf.* Haley, *supra* at 154 ("The application of the good-faith doctrine does not require a contract, but rather simply that a 'legal relationship' between the parties has come into existence."). As discussed above, SKI has submitted factual evidence from which a reasonable jury could conclude that SKI could not replicate its source of supply within a six-month time period. SKI also claims to have made investments in reliance on its relationship with TSS. If credited, this evidence could allow a jury to conclude that six months did not provide SKI adequate notice.

Additionally, the question of the justification for termination and the requisite notice needed are not entirely distinct. Professor Haley's opinion states that "whether or not notice of unilateral termination is legally valid ultimately depends in effect on the appropriateness of the timing of the termination, which in turn is resolved by an examination of the particular circumstances of the case. The adequacy of the timing of an attempted termination is in effect conflated with its justification." J.A. at 820 (citations omitted). As previously discussed, SKI has presented evidence from which a jury could conclude that TSS's termination of the Agreement was not legally justified. This also supports our conclusion that a jury could find six months notice to be inadequate.

Contrary to TSS's contention, the Agreement does not address the issue of adequate notice in a manner that bears upon the inquiry of whether "good reason" existed for terminating the Agreement. TSS argues that, as the district court held, six months notice should be deemed adequate because that was the length of notice provided in the contract. The Agreement states that:

> During the term of this Agreement each party may terminate this Agreement by giving six (6) month [sic] prior written notice to the other party, provided however, such right of termination shall not be exercised without good reason.

J.A. at 281.

TSS's argument conflates the length of notice that the parties agreed to *in the event that* good reason for terminating the Agreement exists into a factor *constituting* good reason. Such bootstrapping does not properly reflect the bargain between TSS and SKI. This provision is of little relevance to the question of the propriety of termination on six months notice.

In light of these facts, the district court erred in granting summary judgment in favor of TSS on the issue of whether it breached the Agreement. The dissent, like the district court below, reaches the contrary conclusion only by derogating the contract itself. The dissent calls the Agreement a "ninth-inning contract," echoing the district court's opinion, which dubbed it an "eleventh hour agreement." Dis. Op. at 18-19. Both opinions then conclude–by standing a fundamental principle of contract law on its head–that the fact that the Agreement was executed by TSS and SKI with the intention of protecting SKI is a reason why it should not have this effect. Although not to Moog's liking, the TSS-SKI agreement was executed by TSS directors who had the power to enter into the Agreement, and Moog purchased TSS with full knowledge of its binding contractual obligations. The circumstances surrounding the Agreement provide no reason why this valid contract should not be given its full effect. Because a reasonable jury could find in favor of SKI on both questions of fact that determine the existence of "good reason" under Japanese law, we therefore reverse the judgment of the district court.

## C.    PIERCING THE CORPORATE VEIL

Assuming that SKI can establish its breach of contract claim at trial, SKI argues that Moog should be liable for TSS's breach under a veil-piercing theory. The parties agree that this issue is governed by the law of the state of Michigan. This Court will thus apply Michigan law as determined by the Michigan Supreme Court. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). If the Michigan Supreme Court has not spoken to a particular issue, we must predict how the Michigan Supreme Court would rule if confronted with that issue. *Id.* (citing *Stalbosky v. Belew*, 205 F.3d 890, 893-94 (6th Cir. 2000)).

Under Michigan law, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, 537 N.W.2d 221, 224 (Mich. 1995) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 761 (Mich. 1947)). "This presumption, often called the 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Id.* (alteration in original) (quoting *Wells v. Firestone*, 364 N.W.2d 670, 674 (Mich. 1984)). Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss. *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996) (citing *SDC Chem. Distribs., Inc. v. Medley*, 512 N.W.2d 86, 90 (Mich. Ct. App. 1994)); *see also Gledhill v. Fisher & Co.*, 262 N.W. 371, 372 (Mich. 1935). The propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be

intensively fact-driven. *Kline v. Kline*, 305 N.W.2d 297, 299 (Mich. Ct. App. 1981) (per curiam); *see Herman*, 26 N.W.2d at 761 ("In determining whether the corporate entity should be disregarded and the parent company held liable on the contracts of its subsidiary because the latter served as a mere instrumentality or adjunct of the former, each case is sui generies and must be decided in accordance with its own underlying facts.")

Turning to the first element, we conclude that a reasonable jury could find that TSS was a mere instrumentality of Moog. As the district court noted, although Moog asserts that TSS continues to exist as a separate entity, the extent of its existence is unclear. In any event, viewed in the light most favorable to SKI, the facts demonstrate that Moog has dismantled TSS for its benefit, such that TSS is a mere instrumentality of Moog. Moog's plan was to "integrate [TSS's] business into Moog as quickly as possible." Email to All Moog Pacific Employees from Sean Gartland, President and Representative Director of Moog Japan and Director of all Pacific subsidiaries of Moog (April 24, 2002) (J.A. at 383). Pursuant to this plan, TSS's factory was sold, the majority of TSS's employees were laid off and those that were not were integrated into Moog, and TSS's customers were transferred to Moog. These TSS assets that were transferred to Moog–customer relationships, employees, the revenue from the sale of the factory, in short, the ability to operate as a business–were valuable, and there is no evidence that TSS was paid *anything* in return for its assets that were stripped for the benefit of Moog. The overlap between TSS directors and Moog is also relevant to the question of whether TSS was a mere instrumentality. SKI asserts that, as of the period immediately after Moog's acquisition of TSS, all five of the directors of TSS were employees of Moog.[8] While the fact that TSS directors consisted entirely of Moog employees is undeniably insufficient, *ipso facto*, to disregard the corporate form, see *Maki v. Copper Range Co.*, 328 N.W.2d 430, 433 (Mich. Ct. App. 1982), this fact nonetheless supports the conclusion that TSS was a mere instrumentality of Moog.

Taken together, these facts are sufficient to allow a reasonable jury to find that Moog and TSS were a single entity for purposes of liability for breach of contract. *See Herman*, 26 N.W.2d at 762 ("If a corporation is owned and controlled by another and is manipulated by the owner for its own purposes and in its own interests to the prejudice of innocent third parties . . . it may be necessary to limit such abuse of the corporate capacity or shield." (quoting Henry W. Ballantine, *Separate Entity of Parent and Subsidiary Corporations*, 14 Cal. L. Rev. 12, 18 (1925))). In the parent-subsidiary context, the protections of the corporate form are premised on the assumption that parent and subsidiary corporations operate as separate entities. Where the assets of the subsidiary are employed for the benefit of the controlling corporation, in a manner other than as a benefit to the controlling corporation in its capacity as a shareholder, that fact supports finding that the subsidiary was a mere instrumentality of the parent. *Cf. Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704-05 (6th Cir. 1988) (holding that undercapitalization is relevant to the determination of whether the corporate veil should be pierced). SKI has alleged that such is the case here.

Turning to the second element, we hold that, assuming that a jury concluded that SKI could recover for breach of contract, this breach would constitute a "fraud or wrong" for the purpose of veil-piercing liability. *See Herman*, 26 N.W.2d at 763; *see also Papo v. Aglo Rests. of San Jose, Inc.*, 386 N.W.2d 177, 185 n.15 (Mich. Ct. App. 1986) (noting that the Michigan Supreme Court has "acknowledged that the corporate veil can be pierced in the absence of fraud" and upholding a veil-piercing claim based on the breach of a lease). Moog argues that the fact that SKI contracted with

---

[8]The TSS directors were Sean Gartland, also the General Manager of Moog Pacific; Gary Parks, a Moog employee in the United Kingdom; Martin Berardi, Vice President of Moog, Inc.; Stephen A Huckvale, Vice President and General Manger of Moog Inc.'s International Group; and Tomatsu Harada, an employee of Moog Japan.

TSS when TSS was a separate entity means that SKI cannot avail itself of remedies against Moog. According to Moog, a party who chooses to contract with a subsidiary with knowledge of the subsidiary's separate corporate existence cannot later pursue the parent for the wrongs of the subsidiary. *See City of Dearborn v. DLZ Corp.*, 111 F. Supp. 2d 900, 902 (E.D. Mich. 2000). Moog is correct that this is a valid proposition as a general matter; this argument, however, stands the facts of this case on their head. The fact that a plaintiff has knowledge of a subsidiary's separate existence at the time of the contract is relevant because that knowledge allows an inference that the plaintiff voluntarily undertook the risks associated in contracting with the subsidiary. That fact has no relevance to the situation here, where the facts that justify piercing the corporate veil all arose *as a result* of Moog's acquisition of TSS. SKI undertook the risks of contracting with an independent TSS; it did not voluntarily agree to limit its remedies for breach of contract to a corporation operated as a mere instrumentality of its parent.

Moog also argues that, because SKI executed the Agreement at a time when there were rumors that Moog would purchase TSS, SKI could not have been deceived by Moog's use of the corporate form. This argument is without merit. Nothing in the law requires that SKI be bound by rumors of what was "likely" to occur. When SKI contracted with TSS, TSS was an independent entity that had no legal relationship to Moog. SKI was entitled to rely on the assumption that TSS would continue to be operated for the benefit of the entity. If a jury finds that Moog subsequently used TSS as an instrument to commit an injurious fraud or wrong, piercing the corporate veil is proper.

The parties do not seriously contest the issue of whether an unjust loss has occurred. Accordingly, we hold that if a reasonable jury finds that the other elements of veil-piercing liability are satisfied, the fact that SKI suffered losses from TSS's breach of contract is sufficient to constitute an unjust loss for the purpose of veil-piercing liability. *See Foodland Distribs.*, 559 N.W.2d at 382. Because a reasonable jury could find for SKI on all the elements of its claim, we reverse the grant of summary judgment in favor of Moog on the issue of veil-piercing liability.

## D.     TORTIOUS INTERFERENCE WITH CONTRACT

The parties agree that Michigan law governs SKI's tortious interference with contract claim. Under Michigan law, tortious interference with contract requires "(1) a contract; (2) a breach; and (3) instigation of the breach without justification by the defendant." *Tata Consultancy Servs. v. Sys. Int'l Inc.*, 31 F.3d 416, 422 (6th Cir. 1994) (quoting *Wood v. Herndon & Herndon Investigations, Inc.*, 465 N.W.2d 5, 8 (Mich. Ct. App. 1990)). Additionally, "tortious interference with contract requires proof . . . that the defendant was a 'third-party' to the contractual relationship." *Willis v. New World Van Lines, Inc.*, 123 F. Supp. 2d 380, 396 (E.D. Mich. 2000) (citing *Cook v. Little Caesar Enters., Inc.*, 972 F. Supp. 400, 414-15 (E.D. Mich. 1997)). Because we conclude that SKI cannot demonstrate that Moog was a third party to the TSS-SKI contract, we need not consider whether SKI could prevail on the other elements of its claim.

In *Dzierwa v. Mich. Oil Co.*, 393 N.W.2d 610, 613 (Mich. Ct. App. 1986), the plaintiff sued defendant Smith, a controlling shareholder, for inducing defendant Michigan Oil Company ("MOC") to breach the plaintiff's employment contract. *Id.* The plaintiff argued that the dismissal was for reasons personal to Smith. *Id.* The Michigan Court of Appeals upheld the trial court's dismissal of the case. *Id.* at 614. It reasoned that Smith was a director, the president, a controlling shareholder, and a director and chief executive officer of MOC's parent corporation. *Id.* at 613. Smith, the court noted, had "express authority and responsibility for hiring, evaluating, supervising, and terminating plaintiff on behalf of MOC. In short, Smith *is* the company on these facts." *Id.*; *see also Willis*, 123 F. Supp. 2d at 396-97 (sister corporation is not a third party to the contract for purposes of tortious interference with contract).

A similar unity of the parties exists in this case. The factors that favor piercing the corporate veil also require that we find that Moog is not legally a third party vis-a-vis TSS for purposes of the tort of tortious interference with contract. In the period following Moog's acquisition of TSS, Moog replaced TSS's directors with its own employees, transferred TSS's customers to Moog, drastically reduced TSS's workforce by either laying off TSS employees or hiring them at Moog, and sold TSS's facilities. These facts demonstrate that there was functionally only one corporation, Moog, which could not induce a breach in what was in effect its own contract.

SKI tries to avoid the rule that a defendant must be a third party to the contract by arguing that a controlling corporation should be analyzed under the same standards applicable to corporate agents. Under Michigan law, "corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation." *Reed v. Mich. Metro Girl Scout Council*, 506 N.W.2d 231, 233 (Mich. Ct. App. 1993) (per curiam). SKI argues that, because Moog's actions were for the benefit of Moog, and not for the benefit of TSS, Moog can be liable for tortious interference with contract. This argument is without merit. Where a corporate agent interferes with the contracts of the corporation solely for his or her own personal benefit, he or she is wearing the hat of an outsider to the contractual parties. More importantly, the economic interests of an agent acting in his or her personal capacity and the economic interests of the corporation–an entity that operates for the benefit of its shareholders–are not aligned. The same is not true for a controlling shareholder, whose interests are unified with the interests of the controlled corporation. *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d Cir. 1995) ("Because there is a significant unity of interest between a corporation and its sole shareholder–indeed, an even greater unity than that which exists between a corporation and its agents or officers–we do not believe that such a shareholder can be considered a third party capable of 'interfering' with its own company's contracts."); *see also Canderm Pharmacal Ltd. v. Elders Pharms. Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) (corporate parent could not interfere with subsidiary because it "was, in effect, the same entity" as the subsidiary). Because Moog owns 98% of TSS shares, Moog and TSS are, for purposes of a tortious interference with contract action, the same party. Because Moog cannot as a matter of law commit the tort at issue, we affirm the grant of summary judgment in favor of Moog.

### III.

On appeal, SKI argues not only that summary judgment was improperly granted in favor of Defendants, but that the district court erred in denying its motion for partial summary judgment with respect to Defendants' liability for breach of contract and veil-piercing.[9] This argument lacks merit. Viewing the evidence in the light most favorable to Defendants, there is no doubt that a reasonable jury could find that TSS had "good reason" for terminating the Agreement. The relevant facts are thoroughly discussed in the context of the district court's grant of summary judgment in favor of TSS, and we will only briefly review them here. According to Moog, the contract was terminated because, after purchasing TSS, Moog discovered that it was in worse financial shape than expected because of fraudulent accounting practices. Moog therefore chose to close the TSS factory and discontinue TSS's unprofitable product lines. Now, Moog Japan allegedly does not sell servo valves in North America, and Moog in North America is obligated by exclusive distribution agreements to other distributors. Additionally, according to TSS, the termination of the Agreement was motivated by the fact that SKI was in arrears to TSS. If credited by a jury, these facts would constitute "good reason" for terminating the Agreement under Japanese law, regardless of SKI's

---

[9]SKI also argues that summary judgment should have been granted in its favor on its tortious interference with contract claim. Because we affirm the grant of summary judgment in favor of Moog, it follows *a fortiori* that summary judgment should not be granted in favor of SKI.

dependency on TSS.[10] Summary judgment in favor of SKI is therefore not appropriate on the issue of TSS's liability for breach of contract. And because a jury could find for TSS on the issue of breach of contract, it follows, *ipso facto*, that a jury could find for Moog on SKI's veil-piercing claim.[11]

## IV.

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment in favor of Defendants on SKI's breach of contract and veil-piercing claims. We **AFFIRM** the district court's grant of summary judgment in favor of Moog on SKI's tortious interference with contract claim, and **AFFIRM** the district court's denial of summary judgment to SKI with respect to all claims.

---

[10] The foregoing discussion, which views every fact in the light most favorable to TSS, is not intended to suggest that a jury must find in favor of TSS on all disputed factual issues in order for TSS to prevail on the breach of contract claim.

[11] Of course, the burden of establishing veil-piercing is on SKI, and establishing its breach of contract claim is not sufficient to justify disregarding the corporate form.

---

### CONCURRING IN PART, DISSENTING IN PART

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. I have some sympathy for the majority's position on this difficult case but ultimately find myself unable to come to terms with its breach-of-contract analysis.

At issue is the following contract provision:

> During the term of this Agreement each party may terminate this Agreement by giving six (6) month[s] prior written notice to the other party, provided however, such right of termination shall not be exercised without good reason.

JA 281. "[G]ood reason" is not defined by the contract. On a first reading, one might fairly ponder why anyone would put such an amorphous, litigation-inducing term in a contract and why, having done so, they should not suffer the fate they deserve—the uncertain judgment of a Michigan jury over whether TSS had "good reason" for terminating this contract. Like I said, I have some sympathy for the majority's position.

But this case does not arise under American law. It arises under Japanese law, and that country's legal customs put the phrase in context—a context that ultimately convinces me that Judge Cohn correctly rejected SKI's breach-of-contract claim as a matter of law. As we learn from Professor John Haley, the court-appointed expert on Japanese law: to have "good reason" to terminate a contract under Japanese law is to have "commercially legitimate" reasons for terminating the contract. JA 820.

Here is how Professor Haley frames the issue and how he ultimately concludes his analysis of the question before us:

> I am not aware of any Japanese case in which intermediate termination—that is, termination before the expiration of the stated term—of an exclusive distribution contract by the manufacturer/seller was either the consequence or expressly justified on the basis of acquisition by a competitor with a separate distribution network. To the extent, however, that the termination was in fact motivated by legitimate commercial concerns resulting from such acquisition, in my opinion, a Japanese court would consider the manufacturer/seller to have "good reason" for intermediate termination so long as adequate notice, as noted, was given.

*Id.*

As the court-appointed expert sees it, then, Japanese courts would ask two questions in resolving this dispute: Did TSS give "adequate notice" of the termination? And did it have "legitimate commercial concerns" for terminating the contract? As I see it, both questions must be answered in the affirmative on this record.

The contract itself suggests that six months represents adequate notice because that is the notice to which the parties agreed. "Express provisions of the contract matter," as Professor Haley points out. *Id.* And it strains credulity to believe that SKI was not aware of the risk that the imminent purchase of TSS by Moog would lead to the termination of the contract before its five-year term; that risk is why the parties negotiated the contract in the first place. Having chosen to address that risk by negotiating and signing the five-year contract, SKI has little ground for maintaining that

the notice—to which it agreed—was somehow inadequate. The risk that prompted the sudden creation of this contract, after 15 years of doing business on a casual one-year-at-a-time, non-exclusive basis, is the very risk that materialized. All of this explains why SKI cannot point to any reliance interests established between the date of the contract and its termination. As Professor Haley points out, moreover, "[a]bsent exceptional circumstances, six months notice has usually been deemed adequate." JA 821. That this contract expressly permitted unilateral termination after six months of notice, when the contracting parties knew full well the risk of termination at the time they signed the contract, shows that respecting the six-month term is far from exceptional.

TSS also had "legitimate commercial" reasons for terminating the contract. In its termination letter, TSS explained that "[t]here has been a change in ownership of TSS and a change in management. . . . The TSS/SKI Exclusive Distributor Agreement . . . would place in serious conflict and disarray the product distribution arrangements around the world of TSS and Moog and all Moog subsidiaries . . . ." JA 389. TSS later provided other reasons for the termination: SKI's failure to comply with its end of the bargain by failing to pay its bills on time, financial problems at TSS caused by accounting irregularities and the eventual closing of the TSS facility. Much of the parties' dispute in our court has focused on whether fact disputes exist over TSS's motives for terminating the contract, though no one disputes that the reason given in the letter is one of the reasons (and perhaps the only reason) that TSS canceled the agreement.

The parties' fencing about TSS's *other* reasons for terminating the agreement obscures several essential commercial realities about this dispute, realities that make TSS's initial explanation a "commercially legitimate" one by itself. Before the merger: Moog competed with TSS in the servo-valve repair business; SKI was one of TSS's distributors; Moog had its own international product-distribution system; and Moog thus competed with both TSS and SKI. After the merger, as the termination letters states, Moog wished to use its own pre-existing product-distribution network rather than using its former competitor's distribution network—which included SKI.

These undisputed facts, it seems to me, establish "commercially legitimate" grounds for ending the contract. Is it not the case that one profit-driven company may purchase another profit-driven company for the purpose of expanding profits—even if that means that a third profit-driven company bears the risk of losing profits? I should have thought that it was an everyday occurrence in the commercial world, whether in Japan or the United States, that one competitor takes over another with the purpose of exploiting the buyer's pre-existing commercial strengths—whether that is a distribution network, as here, or a large sales force, as in other mergers—and capturing the economic synergies of the transaction by shrinking the size (and costs) of the seller's assets in the same area. Had the purpose of this takeover been to create an illegitimate monopoly, that would be another matter—for that would present a commercially illegitimate, and thus impermissible, ground for the termination. But SKI does not claim that the takeover (or the termination of the TSS-SKI contract) violates any antitrust laws. That leaves only the question, as framed by Professor Haley, of whether Moog had a right to buy TSS and terminate its existing distribution network for "commercially legitimate" reasons, not whether it had legitimate *non-commercial* reasons for doing what it did.

What makes this conclusion even more irresistible is SKI's conduct before the takeover, which showed it to be anything but a meek participant in the (apparently) sharp-elbowed world of servo-valve repairs. As word leaked out that Moog would buy TSS, SKI went to great lengths to transform the parties' practice of signing one-year *non-exclusive* distribution agreements into a hastily thrown together five-year *exclusive* distribution agreement. Not only does SKI take the position that this ninth-inning contract prohibits TSS from terminating the TSS-SKI contract today, but it also takes the position that TSS cannot (based on the reasons given so far) terminate it at any point during the five-year term or even at the end of the term. *See* Br. at 27, 29; Reply Br. at 19,

20–21. Who says that the office of a general counsel cannot be a profit center? What makes all of this particularly rich is SKI's repeated claim that TSS and Moog did what they did to "squelch competition." Br. at 16–18, 20–21, 24. Agreements that may not be terminated by their terms run a far greater risk of squelching competition than ones that may be so terminated.

> Judge Cohn in the final analysis, it seems to me, got it right when he said:

> At the end of the day, SKI is simply the victim of a legitimate business decision brought upon by the acquisition of TSS by one of its competitors. SKI knew at the time it entered the agreement with TSS that TSS was likely to be acquired, as well as what such acquisition might mean for SKI. Former TSS management and SKI then executed an eleventh hour agreement in hopes of protecting SKI after the acquisition. Their attempt failed as TSS had legitimate, not tortious, commercial reasons for terminating the agreement.

D. Ct. Op. at 15. In the absence of any Japanese case law to the contrary in this setting and in reliance on Professor Haley's expert opinion, I would follow Judge Cohn's lead in rejecting the contract claim as a matter of law and in determining as a result that the veil-piercing claim against Moog (with respect to liability on the contract claim) is of no moment.

I agree with the majority that Moog is entitled to summary judgment on SKI's tortious interference claim. I therefore respectfully concur in part and dissent in part.