RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0077p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

No. 18-1712

EDWARD J. HOLLAND, JR.,

*Defendant*,

EDWARD HOLLAND L.P., THE ROYAL BANK OF SCOTLAND GROUP PLC; FREDERICK A. PATMON, SR.; PEGGY YOUNG, as the personal representative of the Estate of Hallison H. Young,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-10082—Marianne O. Battani, District Judge.

Argued: July 30, 2019

Decided and Filed: March 10, 2020

Before: McKEAGUE, KETHLEDGE, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Geoffrey J. Klimas, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Neal Nusholtz, NEAL NUSHOLTZ, P.L.L.C., Troy, Michigan, for Appellee Edward Holland L.P. Gregory J. Fleesler, MOSES & SINGER LLP, New York, New York, for Appellee The Royal Bank of Scotland. **ON BRIEF:** Geoffrey J. Klimas, Joan I. Oppenheimer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Neal Nusholtz, NEAL NUSHOLTZ, P.L.L.C., Troy, Michigan, for Appellee Edward Holland L.P. Gregory J. Fleesler, Matthew Handler, MOSES & SINGER LLP, New York, New York, for Appellee The Royal Bank of Scotland. Avery K. Williams, WILLIAMS ACOSTA, PLLC, Detroit, Michigan, for Appellee Estate of Hallison H. Young through its personal representative, Peggy Young.

————————————

**OPINION**

————————————

KETHLEDGE, Circuit Judge.  For decades the government has tried, on a rolling basis and with varying success, to collect millions of dollars of unpaid taxes from Edward Holland, Jr. Here, the government seeks to seize about $20 million of assets previously held by a partnership created by Holland, on the theory that the partnership's assets were really Holland's own.  The district court rejected those arguments, and so do we.

I.

The Internal Revenue Service has authority to investigate and to make assessments for taxes not paid "at the time and in the manner provided by law."  26 U.S.C. § 6201(a).  If a taxpayer "neglects or refuses" to pay an assessed amount, the government obtains a lien in that amount upon "all property" owned by the taxpayer.  *Id*. § 6321.  The government can then seize the taxpayer's property to satisfy the government's claim for unpaid taxes.  *Id*. § 6331.

Holland has stipulated that he owes the government about $20 million in unpaid taxes and penalties.  The question here is whether the property that the government now seeks to seize belongs to him, rather than to the partnership to which he transferred that property more than 20 years ago.

Holland made his name as a Motown songwriter in the 1960s, with hits like "Stop in the Name of Love" and "Baby Love."  He later sold his song-rights to two music companies, in exchange for the right to royalty payments for the songs.  Those royalty assets then served as Holland's primary source of income.

Beginning in the 1970s, Holland failed fully to report and pay taxes on his royalty income.  As a result, between 1986 and 1990, the IRS levied Holland's royalty assets and recovered approximately $1.5 million.  In June 1997, the IRS informed him that it intended again to levy the royalty assets, this time to satisfy taxes owed for 1996.

Meanwhile, in October 1997, Holland retained a team of professionals to prepare and execute a transaction—which was itself common enough in financial circles—by which he would convert his interest in future royalty payments into a present lump sum of cash. Specifically, Holland would create a partnership wholly owned by him, to which he would transfer title to the royalty assets, which were then worth about $23.3 million; the partnership would then borrow (by means of the issuance of notes) $15 million, for which the royalty assets would serve as collateral. Holland's representatives informed the IRS about the pending transaction in advance; the agency replied that Holland was free to "conduct his normal course of business" at that time.

Over the next several months, Holland's professionals prepared to execute the transaction, while the IRS continued to investigate his tax liabilities. In April 1998, the IRS told Holland that it was examining his tax payments for 1995. A month later, the IRS told Holland that it thought he owed about $1.8 million in taxes and penalties, as well as $2.1 million in interest, for his underpayments for the 1991–94 years. The IRS did not, however, record an assessment for that amount at that time.

A few days later, Holland executed the transaction to monetize his royalty assets. At the close of the transaction, Bankers Trust (which served as a trustee of sorts for the deal) paid $8.4 million directly to Holland and about $5 million in fees to the lawyers and bankers who structured it. Bankers Trust also placed $1.7 million in escrow, which was then used to pay Holland's debts—notably including the entire amount (about $1.4 million, for the 1986 and 1990 years) of the IRS's assessments against Holland at that time. The IRS did not assess any additional amounts against Holland until 2003, more than four years later.

In December 2005, the partnership entered into an agreement with Royal Bank of Scotland to refinance the partnership's outstanding debt from the 1998 deal. Under this agreement, Royal Bank paid about $9 million to Bankers Trust to pay off the notes issued by the partnership in 1998. Royal Bank also paid $1.1 million to Holland and made available to the partnership a $4.3 million credit line. As collateral, Royal Bank received a security interest in the royalty assets. During 2006 and 2007, the partnership requested the remaining $4.3 million of the loan from Royal Bank, which then sent those funds directly to Holland or his creditors.

The IRS thereafter recorded numerous liens against Holland for unpaid taxes. In February 2012, the IRS concluded that the partnership held the royalty assets as Holland's nominee, alter ego, or fraudulent transferee—in essence, that his transfer of those assets to the partnership was a fraud upon his creditors. As a result, the IRS recorded a $20 million lien against the partnership, thereby treating its assets as Holland's own.

The government later brought this lawsuit to enforce that lien, naming Royal Bank as an interested party. The district court thereafter ordered the partnership to sell the royalty assets, for which it obtained $21 million. The court put those proceeds into an interpleader fund, to be distributed to the partnership's creditors in order of priority. The government then moved for summary judgment on its claim to enforce its lien against the partnership's assets (now the $21 million in cash). That lien—if valid against the partnership, as opposed to being valid against only the taxpayer himself—would take priority over Royal Bank's security interest in the proceeds, thereby largely frustrating the bank's ability to collect on its 2005 loan. Royal Bank thus filed a cross-motion for summary judgment, arguing that the 1998 and 2005 transactions were legitimate rather than fraudulent, and that the partnership's assets therefore should not be treated, for purposes of the IRS's assessments, as Holland's own. The district court granted Royal Bank's motion and denied the government's, holding as a matter of law that the 1998 and 2005 transactions had not been devices to thwart Holland's creditors. The court thus entered final judgment in favor of Royal Bank under Civil Rule 54(b). This appeal followed.

II.

We review de novo the district court's decisions on the motions for summary judgment. *Hatchett v. United States*, 330 F.3d 875, 879 (6th Cir. 2003).

The government offers three theories as to why it thinks we should disregard the separate form of Holland's partnership and treat its assets as Holland's own for purposes of the government's ability to collect on them. Those theories are that the partnership was Holland's "nominee"; that it was his "alter ego"; and that his transfer of the royalty assets to the partnership was a fraudulent conveyance. With perhaps one exception, those theories present questions of state law; and the parties' dispute as to which state's law should apply (Michigan, New York, or

Delaware) is immaterial here because the relevant law for each state is substantially the same. (The potential exception as to the applicability of state law is the alter-ego theory, which the government suggests is governed by "federal common law"; but that law, as recited by the government, is no different than Michigan's, so this dispute too is immaterial.)

All three theories fail as a matter of law for the reasons that the district court said they did: namely, that Holland received adequate consideration for his transfer of the royalty assets to the partnership in the 1998 transaction, and that the government otherwise lacks evidence that the transfer of those assets was made with the goal of thwarting the government's ability to collect on its assessments against Holland. *See generally, e.g.*, *Spotts v. United States*, 429 F.3d 248, 253 (6th Cir. 2005) (nominee theory); *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007) (alter-ego theory); Mich. Comp. L. Ann. § 566.17 (fraudulent-conveyance theory). As an initial matter, the government does not dispute that transactions to monetize future revenue are both common and facially legitimate, or that the use of a separate corporate form (here, a partnership) in such transactions is often necessary to isolate the future revenue stream as a source of collateral for the transaction. *See, e.g.*, *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 695 (7th Cir. 2010) (Easterbrook, J.).

As for the adequacy of consideration, the transfer of assets itself in the 1998 transaction left Holland financially no worse off than he had been before, since he owned the partnership. Nor was the $15 million loan itself a device to thwart Holland's creditors: $8.4 million of the loan proceeds went back to Holland; another $1.7 million was used to pay off Holland's debts, including the entire $1.4 million of IRS assessments then pending against him; and the remaining $5 million or so was used to pay the fees of the lawyers and bankers whom Holland retained to prepare and execute the transaction. The government is correct, of course, that those transaction costs "meant that the value of cash and partnership interests Holland ended up with was $5 million less than the value of the royalty assets he paid to the partnership." Gov't Br. at 27. That left $5 million less for Holland's creditors to collect from him. But Holland had just paid off substantially all of his extant creditors *in that very transaction*. And so far as consideration is concerned, Holland undisputedly received the benefit of those lawyers' and bankers' services in exchange for that $5 million. Moreover, if the payment of that $5 million harmed Holland's

future creditors, it obviously harmed Holland first. That Holland himself might have been fleeced by the $5 million tab for the 1998 transaction therefore provides no support for the government's assertion that the transaction's purpose was to thwart his future creditors.

Nor does the government have other evidence creating a genuine issue as to whether the transfer of his partnership assets was a fraud upon the IRS or his creditors. Even after the close of the 1998 transaction, the government could have levied Holland's shares in the partnership—then worth $8.3 million, which was the amount the loan was overcollateralized—along with the $8.4 million in cash that Holland received from the loan. The reason the government did not do so is that Holland had just paid off all the IRS's assessments as a result of that very transaction; and the IRS did not record any additional assessments against him until 2003, more than four years later. The government complains that by then Holland had dissipated much of the $8.4 million that he received in the 1998 transaction. But that is what people tend to do with money: spend it. The IRS's more than four-year delay in making additional assessments against Holland—rather than the 1998 transfer of royalty assets itself—is to blame for the government's collection difficulties now.

The government also emphasizes that, shortly before the 1998 deal, the IRS informed him that it thought he owed $3.9 million in unpaid taxes, penalties, and interest for the 1991–94 tax years; but again the IRS did not record an assessment for those years until 2003, and then in the amount of only $1.3 million. Moreover, that Holland's representatives informed the IRS about the 1998 deal in advance, and that the IRS made no objection to it, defeats any inference that the transaction's purpose was to thwart the IRS's collection of unpaid taxes for those same years. Finally, on this record, that Holland was often sloppy about observing corporate formalities likewise does not support any inference that he transferred the royalty assets to thwart his creditors.

In sum, Holland's transfer of the royalty assets was part of a transaction pedestrian in nature—the monetization of a future revenue stream—and executed with the knowledge and indeed arguably the blessing of the IRS. In seeking to have us disregard that transfer, the government in essence assumes—notwithstanding Holland's satisfaction of all the IRS's then-existing assessments as a result of the 1998 deal—that Holland had a quasi-fiduciary duty not

only to preserve his assets, but to maintain them in a form easily accessible to the IRS years later. On this record, at least, no rule of law supports that assumption.

The district court's judgment is affirmed.