Steven **SCHALLER**, et al., Plaintiffs,

v.

**NATIONAL ALLIANCE INSURANCE COMPANY**, et al., Defendants.

No. 3:05cv093.

United States District Court,
S.D. Ohio,
Western Division.

July 6, 2007.

Robert Forsythe Croskery, Croskery Law Offices, Cincinnati, OH, for Plaintiffs.

Randall J. Moore, Roetzel & Andress, Akron, OH, Barry Alan Mentser, Columbus, OH, for Defendants.

DECISION AND ENTRY SUSTAINING DEFENDANT BAILEY'S MOTION FOR SUMMARY JUDGMENT (DOC. # 80) AND DEFENDANT NATIONAL'S MOTION FOR SUMMARY JUDGMENT (DOC. # 81); DECISION AND ENTRY OVERRULING, AS MOOT, DEFENDANT NATIONAL'S MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY OF MILDRED SCHALLER (DOC. # 90), MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY OF PLAINTIFFS' EXPERTS (DOC. # 91), MOTION IN LIMINE TO EXCLUDE TESTIMONY OF STEVE PHILPOT (DOC. # 92), MOTION TO COMPEL (DOC. # 93) AND MOTION FOR AN ORDER DEEMING DEFENDANT'S REQUEST FOR ADMISSIONS ADMITTED (DOC. # 101); DECISION AND ENTRY OVERRULING, AS MOOT, PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE CERTAIN INFORMATION AS TO VALUE OF MOTOR HOME (DOC. # 98) AND MOTION TO SUPPLEMENT ADMISSIONS (DOC. # 112); INSTRUCTIONS TO DEFENDANT NATIONAL

RICE, District Judge.

Plaintiffs, Steven and Mildred Schaller, owned two vehicles-a motor home and a car-both of which were insured by Defendant National Alliance Insurance Company ("National"). While driving the motor home and towing the car on Interstate 75, north of Dayton, Steven Schaller fell asleep and drifted into the concrete median. The accident caused damage to both vehicles. Following the accident, National hired Defendant Tom Bailey to conduct an appraisal of the damage to the Plaintiffs' motor home. Dissatisfied with Bailey's appraisal, and National's response to their claims, the Plaintiffs filed the instant Complaint against the Defendants alleging Bad Faith (Count One), Conspiracy to Act in Bad Faith (Count Two), Breach of Contract (Count Three), Fraud (Count Four), Conspiracy to Commit Fraud (Count Five), Breach of the Ohio Consumer Sales Practices Act, O.R.C. § 1345.01 *et seq.* (Count Six), Conspiracy to Commit Violations of the Ohio Consumer Sales Practices Act (Count Seven) and Negligent Hiring, Supervision and Retention (Count Eight). Doc. # 1 (Compl.). Counts Three and Eight are alleged solely against National; all other claims are alleged against both National and Bailey. *Id.* This matter is currently before the Court on the Defendants' Motions for Summary Judgment. Doc. # 80 (Bailey Mot. Summ. J.); Doc. # 81 (National Mot. Summ. J.). Based on the reasoning and citations of authority contained herein, those motions are SUSTAINED.

Also before the Court are Defendant National's Motion in Limine to Exclude certain Testimony of Mildred Schaller (Doc. # 90), Motion in Limine to Exclude the Testimony of Plaintiffs' Experts (Doc. # 91), Motion in Limine to Exclude Testimony of Steve Philpot (Doc. # 92), Motion to Compel Plaintiffs to Submit Joint Proposed Final Pretrial Order (Doc. # 93) and Motion for an Order Deeming Defendant's Request For Admissions to Plaintiffs Admitted (Doc. # 101). The Plaintiffs have also filed a Motion in Limine to Exclude Information as to Fair Market Value of Motor Home and Information as to Subsequent Sales Price (Doc. # 98), as well as a Motion to Supplement Admissions (Doc. # 112). Given that the Court has sustained the Defendants' Motions for Summary Judgment, decisions made without the need to rule on these motions, same are OVERRULED, as moot.

## I. FACTUAL BACKGROUND [1]

The Plaintiffs, Steven and Mildred Schaller, purchased an Allegro Bus Motor Home ("motor home" or "vehicle") on September 30, 2001, for $150,000.[2] Doc. # 1 (Compl.) ¶¶ 7–8. On March 30, 2002, Steven Schaller was driving the Plaintiffs' motor home and towing their car, on Interstate 75 near Dayton, Ohio. Doc. # 75 (S. Schaller Dep.) Part A at 10–14. Mildred Schaller was the only passenger. *Id.* at 13. While driving, Mr. Schaller fell asleep and the vehicle veered into the center concrete median. *Id.* at 14–16. Both the motor home and the car were damaged in the accident. *Id.* at 30. Immediately following the accident, the Plaintiffs contacted their insurer, National. Doc. # 72 (M. Schaller Dep.) Part A at 32; Doc. # 81 Ex. A (Policy).

In response to the Plaintiffs' call, National hired a representative from Cincinnati Appraisal Service to meet the Plaintiffs and estimate the damage done to the motor home and car. Doc. # 77 (McNiff Dep.) Part A at 23–24. Cincinnati Appraisal Service sent Steve Philpot to conduct the appraisal. Doc. # 72 (M. Schaller Dep.) Part B at 7–8. While examining the motor home, Philpot told Mrs. Schaller that, due to the extent of the damage, the motor home would probably be a total loss. *Id.* at 10; Doc. # 82 (Philpot Aff.) ¶ 5.

Following his examination of the vehicles, Philpot spoke to John McNiff, the agent from National who was handling the Plaintiffs' claims. Doc. # 77 (McNiff Dep.) Part A at 31–34. During that conversation, Philpot informed McNiff that he was not able to provide an estimate for the cost of repairing the damage to the motor home

because of the local unavailability of parts and pricing. *Id.* Philpot later mailed McNiff a suggestion that the motor home be taken to the manufacturer. *Id.* After speaking with Philpot, McNiff decided to have another appraiser look at the vehicle. *Id.* Towards that end, he contacted Defendant Tom Bailey, of RV Appraisals and Investigations of America, LLC. Doc. # 74 (Bailey Dep.) Part A at 15; Doc. # 77 (McNiff Dep.) Part A at 38–39.

Bailey, who lived in Florida, had been doing appraisals for National since 1998. Doc. # 74 (Bailey Dep.) Part A at 27. Bailey and McNiff had worked together on a number of occasions. *Id.* at 40. Bailey had, in the past, marketed his expertise in saving money for insurance companies and had given seminars on the topic of detecting excessive repair costs. *Id.* Part B at 29–30. Upon the request of National, Bailey flew to Ohio from Florida, inspected the motor home and estimated that it would cost between $6,000 and $7,000 to repair. Doc. # 81 Ex. B (M. Schaller Dep.) at 50.

After Bailey informed the Schallers of his estimate, he asked them where they wanted the motor home taken for repairs. Doc. # 74 (Bailey Dep.) Part A at 44. The Schallers, unfamiliar with repair facilities in the area, asked for his help in finding such. *Id.* Bailey researched repair facilities in the area and sent his estimate to some of them with which he felt comfortable. *Id.* at 45. Ultimately, based on Bailey's recommendation, the Schallers chose to have the motor home repaired at East-

---

1. Since this case comes before the Court on the Defendants' Motions for Summary Judgment (Docs.# 80, # 81), the Court sets forth the facts and circumstances giving rise to such motions in the manner most favorable to the Plaintiff. *Servo Kinetics, Inc. v. Tokyo*

*Precision Instruments,* 475 F.3d 783 (6th Cir. 2007).

2. The Schallers also purchased an extended warranty for an additional $3,200. Doc. # 1 (Compl.) ¶ 8.

gate Ford. Doc. # 72 (M. Schaller Dep.) Part B at 24.

After the motor home was transported to Eastgate Ford, an estimate done by its Body Shop Manager raised the cost of repairs to approximately $23,000. Doc. # 81 Ex. I (Eastgate Ford Prelim. Est.).[3] Bailey and National approved the estimate and Eastgate made the repairs. Doc. # 74 (Bailey Dep.) Part C at 14. Seven months later, the Schallers were not satisfied with Eastgate's repair work on the motor home.[4] Doc. # 76 (S. Schaller Dep.) Part A at 48. In response to the Schallers' dissatisfaction with Eastgate, National

agreed to pay to move the motor home to the manufacturer for an inspection and further repairs; however, the Schallers declined their offer.[5] Id. at 48–51.

In August 2004, the Schallers sold the motor home to Robin Trammell, a recreational vehicle dealer and appraiser, for $50,000. Doc. # 83 Ex. 3 (Acceptance Ltr.). At that time, Trammell placed the retail value of the motor home (the value of the motor home had it been repaired such that it was in "like-new condition with reasonable wear and tear" and without some of the original options) at $122,480. Doc. # 78 (Trammell Dep.) at 25–27.[6]

---

3. National relies on the Eastgate Ford Preliminary Estimate, in support of its assertion of the $23,000 repair estimate. Doc. # 81 (National's Mem. Supp.) at 7 & n. 25. National also relies on excerpts from deposition testimony of Mrs. Schaller, Mr. Schaller and Mr. Bailey for the figure. Id. None of the deposition testimony specifically identifies a specific value for the estimate. The Eastgate Ford Preliminary Estimate is attached to National's Memorandum in Support as exhibit I, but is not authenticated. National also states that a copy of Eastgate's damage analysis was marked and identified at page 95 of Mr. Bailey's deposition. Id. While it is true that the estimate was identified and purportedly marked as an exhibit thereto, no actual deposition exhibit is present in the record. See Doc. # 74 (Bailey Dep.). Therefore, while the Court will rely on this estimate in ruling on the issues presented here (given that there is no dispute as to this estimate or the amount of same), specific instructions are given to National regarding placing this evidence in proper Rule 56 form, at the conclusion of this Decision.

4. While in the possession of Eastgate Ford, the motor home was vandalized. Doc. # 72 (M. Schaller Dep.) Part B at 46 & Part C at 1–3. The costs associated with repairing the damage done to the motor home as a result of the vandalism are not at issue here.

5. The Plaintiffs concede that, to the best of their knowledge, National paid all expenses pertaining to the repair of the motor home in a timely manner. Doc. # 72 (M. Schaller

Dep.) Part C at 24; Doc. # 75 (S. Schaller Dep.) Part B at 28.

6. The Plaintiffs acknowledge that Trammell's figure establishes the value of the property just prior to the accident. In their Memorandum in Opposition, they state that the "replacement coverage" value of the vehicle at the time of the accident was "in the neighborhood of $120,000." Doc. 84 (Mem.Opp'n) at 2.

The record also indicates that, after he purchased the vehicle from the Schallers, Trammell made approximately $20,000 worth of repairs and sold it to LaMesa RV Center for $90,000. Doc. # 78 (Trammell Dep.) at 51; Doc. # 81 Ex. M (Manry Aff.). LaMesa RV Center then made an additional $8,300 worth of repairs and resold the vehicle to a private consumer for approximately $147,000, in April 2005. Doc. # 81 Ex. M (Manry Aff.). The Plaintiffs have submitted a Motion in Limine to exclude from evidence any mention of the subsequent history of the motor home after Trammell's purchase for $50,000. Doc. # 98. The Plaintiffs argue that there is no evidence on the record to suggest that the later purchasers were fully aware of the history of the vehicle, including the accident and subsequent repairs, thus making the terms of their uninformed purchases irrelevant. Doc. # 98 at 2–3. In reaching its decision in this case and in construing the record in the light most favorable to the Plaintiffs, the Court will not consider any information relating to the subsequent sales history of the motor home, after the Plaintiffs sold the vehicle to Trammell for $50,000.

Both Defendants seek summary judgment. Doc. # 80 (Bailey Mot. Summ. J.); Doc. # 81 (National Mot. Summ. J.).

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6 th Cir.1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477

U.S. at 324, 106 S.Ct. 2548. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Mich. Prot. & Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath &*

*Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir. 1992), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## III. ANALYSIS

As previously set forth, the Plaintiffs assert eight claims, to wit: Bad Faith (Count One), Conspiracy to Act in Bad Faith (Count Two), Breach of Contract (Count Three), Fraud (Count Four), Conspiracy to Commit Fraud (Count Five), Violation of the Ohio Consumer Sales Practices Act, O.R.C. § 1345.01 *et seq.* (Count Six), Conspiracy to Commit Violations of the Ohio Consumer Sales Practices Act (Count Seven), and Negligent Hiring, Supervision and Retention (Count Eight). Doc. # 1 (Compl.). Counts Three and Eight are alleged solely against National; all other claims are alleged against both National and Bailey. *Id.*

Plaintiffs' claims all center on National's refusal to declare the motor home a "total loss" and to buy the Plaintiffs a replacement, in what they consider to be a breach of the terms of their insurance policy on the vehicle. *See id.* The Court will first address the Plaintiffs' third claim, alleging Breach of Contract, then will address each of the Plaintiffs' remaining claims in the order that they were asserted, concluding with a discussion of the Plaintiffs' combined conspiracy claims. The parties agree that the substantive law of the State

of Ohio applies to each of the Plaintiffs' claims.

### A. *Breach of Contract (Count Three)*

In Count Three, the Plaintiffs allege that National breached its contract with them by failing to declare the motor home a "total loss" and then replacing it with a vehicle of like kind and model, pursuant to the terms of their insurance policy. Doc. # 1 (Compl.) ¶¶ 41–46. As will be more thoroughly explained below, the Plaintiffs do not provide evidence sufficient to raise a genuine issue of material fact to support their contention that their motor home should have been considered a "total loss," under the terms of their policy. Therefore, summary judgment on this issue, in favor of Defendant National, is appropriate.

### 1. *Ohio Law*

█ Under Ohio law, a breach of contract occurs when there is a binding contract or agreement, the non-breaching party performs its contractual obligations, the other party fails to fulfill its contractual obligations without legal excuse and the non-breaching party suffers damages as a result of the breach. *Garofalo v. Chicago Title Ins. Co.,* 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995) (citing *National City Bank v. Erskine & Sons,* 158 Ohio St. 450, 110 N.E.2d 598 (1953)). The Plaintiffs must present evidence sufficient to raise a genuine issue of material fact to support each of these criteria in order to survive Defendant National's motion for summary judgment on the breach of contract claim.

### 2. *Applicable Policy Terms and Ohio Law's Interpretation of Terms Undefined in the Policy*

The Plaintiffs correctly assert that, according to the terms of their insurance policy, National is required to replace the vehicle with a new recreational vehicle of

like make and model, in the event that the vehicle sustains a "total loss." Doc. # 81 Ex. A, Part I (Policy) at 6 ¶ IIA. The policy defines a "total loss" as the "loss or damage from a single occurrence for which the cost of repair or replacement including parts, labor and sales tax exceeds 80% of the actual cash value of the recreational vehicle." *Id.* ¶ IID. In the event that the vehicle does not sustain a total loss, National's liability is limited to the lesser of: (1) the actual cash value of the damaged vehicle, (2) the amount necessary to repair or replace the vehicle, or (3) the difference between the actual cash value of the vehicle immediately before the accident and its actual cash value immediately after the loss. *Id.* at 7 ¶ A. The policy does not define the term "actual cash value."

 Under Ohio law, the term "actual cash value" is defined as either the market value at the time of the accident or the replacement cost of the vehicle minus depreciation. *Jones v. Auto Owners Mut. Ins. Co.,* 1999 WL 435103, *4–5, 1999 Ohio App. LEXIS 3012, 11–12 (Ct.App. June 30, 1999); *see also Paterson–Leitch Co. v. Insurance Co. of North Am.,* 366 F.Supp. 749, 756 (N.D.Ohio 1973) ("[I]n the case of partial loss the test ordinarily utilized in Ohio for determining damages ... is the cash amount that would be required to put the property in the same condition in which it was at the time of the loss...."); *Asmaro v. Jefferson Ins. Co. of New York,* 62 Ohio App.3d 110, 115, 574 N.E.2d 1118 (1989) ("Actual cash value is established by one of two methods in Ohio: market value of the property at the time of loss, or the cost of repairs minus depreciation, if any.") The Plaintiffs have introduced evidence regarding the market value of the motor home, at the time of the accident, but have

offered nothing to indicate what the cost of replacement minus depreciation might be. Consequently, the appropriate measure of "actual cash value" will be the market value of the motor home at the time of the accident.

### 3. *Plaintiffs' Argument*

While conducting the initial inspection of the motor home, Philpot told Mrs. Schaller that due to the extent of the damage, the motor home would probably be a total loss. The Plaintiffs argue that, based on Philpot's statement, National was obligated to declare the motor home a "total loss" and that its failure to do so was a breach of contract.

Philpot did not provide an estimate (written or otherwise) of the actual cost to repair the damage; rather, he recommended that the vehicle be sent to the manufacturer for an evaluation.[7] National then hired Bailey to examine the motor home. Bailey estimated the costs of repairs to be approximately $7,000. After Bailey made his estimate, Eastgate Ford inspected the motor home, revised the estimate upwards to approximately $23,000 and made repairs to the vehicle in accordance with this higher estimate. The Plaintiffs then sold the motor home to Robin Trammell.

The Plaintiffs originally paid $150,000 for the motor home. The accident occurred six months after the purchase of the vehicle. After the accident and after Eastgate had made some repairs to the vehicle, Trammell paid the Plaintiffs $50,000 for the motor home. At this same time, Trammell placed the retail value of the vehicle at $122,480, assuming that the vehicle had been repaired into like-new condition, but without some of the options

---

7. Even if Philpot had provided a written estimate indicating that the vehicle was a "total loss," the Plaintiffs point to nothing in the record to support their contention that Na-

tional was required to use the first appraisal from Philpot or that National was precluded from seeking, and relying upon, a second such.

that the Plaintiffs originally had on the motor home.

As previously stated, the Plaintiffs' policy defines a "total loss" as "loss or damage from a single occurrence for which the cost of repair or replacement including parts, labor and sales tax exceeds 80% of the actual cash value of the recreational vehicle." The Plaintiffs argue that the evidence of record demonstrates that their motor home should have been characterized as a "total loss" under this definition, contending that the value of their motor home after the accident was "significantly less than $30,000," which they compute by subtracting the $23,000 worth of repairs made by Eastgate Ford from the $50,000 amount Trammell paid the Plaintiffs for the vehicle. Doc. # 84 (Mem.Opp'n) at 8. The Plaintiffs further argue that since 80% of the purchase price of $150,000 is $120,000, or alternatively, since the remaining 20% equals $30,000 and because the "postaccident" value of the vehicle was less than $30,000, they have satisfied the policy's requirement for a "total loss." *See id.* at 8–9.

### 4. *Interpretation of Policy Language in Light of Facts of this Case*

■ The Plaintiffs argue that the $50,000 amount paid for the motor home by Trammell set its market value. However, this sum merely provides evidence of the market value of the vehicle *after* the loss and after some repairs were made to it. Ohio law makes clear that the proper time to measure market value is *at the time* of the accident, or more specifically, immediately prior to the accident. *E.g., Paterson–Leitch Co. v. Insurance Co. of*

*North Am.,* 366 F.Supp. 749, 756 (N.D.Ohio 1973). In the same document that offered the Plaintiffs $50,000 for the vehicle, Trammell estimated its retail value to be $122,480, had it been repaired and in "like new" condition, at that time. Thus, according to the evidence offered by the Plaintiffs, the actual cash value of the motor home at the time of the accident was $122,480 [8]; 80% of the actual cash value is, thus, approximately $98,000.

■ In order for a vehicle to be a "total loss" under the policy, the total cost of repairs necessary to return the vehicle to its value just prior to the accident must exceed 80% of the actual cash value of the vehicle. Thus, the Plaintiffs must show that the cost of repairs to return the motor home to its pre-accident value exceeded $98,000 in order to show that the vehicle was a "total loss." The Plaintiffs have set forth no evidence to demonstrate this point. Rather, the Plaintiffs' evidence regarding the sale to Trammell tends to show that after $23,000 worth of repairs made by Eastgate, the vehicle was only worth $50,000 (the price Trammell paid). The Court cannot imply from these facts that it would have taken at least another $75,000 worth of repairs to get the vehicle back into pre-accident condition. Because the Plaintiffs have not set forth facts to demonstrate that the total cost of repairs necessary to return the vehicle to its value just prior to the accident exceeded 80% of its actual cash value, there is no genuine issue of material fact as to the Plaintiffs' breach of contract claim under these provisions of the policy.

The Plaintiffs have not alleged that National did not honor the terms of the con-

---

**8.** The $122,480 figure did not include some of the options the Plaintiffs originally had purchased for the vehicle. No facts were provided to more accurately reflect the pre-accident value with all of the applicable options. Since a higher cash value amount would make the Plaintiffs' task more difficult (because the 80% figure would increase accordingly), the Court will use Trammell's $122,480 figure as a basis for determining the actual cash value of the vehicle.

tract for accidents not involving a "total loss." Since there are no genuine issues of material fact that would indicate that National has breached the contract, Defendant National's Motion for Summary Judgment Doc. # 81 (National Mot. Summ. J.) is SUSTAINED as to Count Three.

### B. Bad Faith (Count One)

 The Plaintiffs allege that the actions of Bailey and National constitute bad faith. Doc. # 1 (Compl.) ¶¶ 30–32. Under Ohio law, "based on the relationship between an insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *Hoskins v. Aetna Life Ins. Co.,* 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983). As to an insurer's denial of a claim:

> [W]henever an insurance company denies a claim of its insured, it will not automatically expose itself to an action in tort. Mere refusal to pay insurance is not, in itself, conclusive of bad faith. But when an insured insists that it was justified in refusing to pay a claim of its insured because it believed there was no coverage of the claim, "such a belief may not be an arbitrary or capricious one. The conduct of the insurer must be based on circumstances that furnish reasonable justification therefor."

*Id.* at 276–77, 452 N.E.2d 1315 (citing *Hart v. Republic Mut. Ins. Co.,* 152 Ohio St. 185, 188, 87 N.E.2d 347 (1949)). Thus, in order to successfully assert a bad-faith claim against National and Bailey, the Plaintiffs must show that the Defendants failed to exercise good faith in refusing to pay the claim, by showing that such refusal was based upon circumstances that did not "furnish reasonable justification therefor." *Id.*; *see also Zoppo v. Homestead Ins. Co.,* 71 Ohio St.3d 552, 554, 644 N.E.2d 397 (1994).

Except for their assertion that the motor home should have been declared a "total loss," the Plaintiffs have offered nothing to support their claim that the Defendants acted in bad faith. National paid the costs of all repairs in a timely fashion, and agreed to pay to have the motor home taken to the manufacturer for an inspection and repairs, when the Schallers were dissatisfied with those done at Eastgate Ford. The Plaintiffs argue that National's failure to act in accordance with Philpot's assertion and its hiring of Bailey are evidence of bad faith. However, as discussed earlier, there is no evidence on the record to suggest that National was obligated to act in accordance with Philpot's estimate, whether written or oral. There is nothing else in the record that would allow a reasonable jury to conclude that either of the Defendants failed to exercise good faith in processing the Plaintiffs' claim.[9] Consequently, the Defendants' Motions for Summary Judgment

---

9. Similar facts are found in an unreported *Ohio Court of Appeals* case from Jackson County. In *Biggs v. Westfield Companies,* 1988 WL 101229, 1988 Ohio App. LEXIS 3855 (Ct.App. Sept. 28, 1988), the plaintiff alleged bad faith against her insurer for refusing to "total" her vehicle and, instead, forcing her to get the vehicle repaired. *Id.* at 1988 WL 101229, *1, 1988 Ohio App. LEXIS 3855, *2. The plaintiff had two written estimates indicating that the vehicle was beyond repair. *Id.* The plaintiff attempted to recover the purchase price of the vehicle less depreciation, among other damages. *Id.* at 1988 WL 101229, *1, 1988 Ohio App. LEXIS 3855, *3. The insurance policy limited liability to the lesser of: "(1) the actual cash value of the stolen or damaged property, or (2) the amount necessary to repair or replace the property." *Id.* at 1988 WL 101229, *2, 1988 Ohio App. LEXIS 3855, *5. After the plaintiff had obtained her two estimates indicating that the vehicle was "totaled," the insurer had the vehicle appraised for $4,800 worth of repairs; repairs were, in fact, made for approximately $4,800. *Id.* at 1988 WL 101229, *3–4, 1988 Ohio App. LEXIS 3855, *8–9. In affirming summary judgment in favor of the

(Doc. # 80 (Bailey Mot. Summ. J.); Doc. # 81 (National Mot. Summ. J.)) are SUSTAINED as to Count One.

### C. *Fraud (Count Four)*

■ Under Ohio law, a plaintiff must satisfy the following elements in order to prove a claim of fraud:

> (a) [A] representation or, where there is a duty to disclose, a concealment of fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) an injury proximately caused by the reliance.

*Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 507 (6th Cir.2003) (citing *Russ v. TRW, Inc.*, 59 Ohio St.3d 42, 49, 570 N.E.2d 1076 (Ohio 1991)). The elements of the fraud claim are conjunctive and, accordingly, the plaintiff must prove all of the elements. *Id.* (citing *Schwartz v. Capital Sav. & Loan Co.*, 56 Ohio App.2d 83, 381 N.E.2d 957 (1978)).

In their Complaint, the Plaintiffs make the following three allegations of fraud: (1) Bailey's representation that the motor home would be repaired to "like new" condition, (2) Bailey's inaccurate estimate of the cost, which was made with the sole intent of inducing the Plaintiffs to authorize Eastgate Ford to make the needed repairs, and (3) National's representations as to the type of policy coverage it was providing to the Plaintiffs, without intending to honor the terms of the policy. Doc. # 1 (Compl.) ¶¶ 49–51.[10]

■ Belying their statement that a "better case of fraud has rarely existed," the Plaintiffs point to no evidentiary support for their fraud allegations. Doc. # 84 (Mem.Opp'n) at 12. Even assuming that the Plaintiffs had introduced evidence sufficient to create a genuine issue of material fact in order to satisfy their burden on the first five elements of their fraud claims, there is no evidence sufficient to raise a genuine issue of material fact regarding the sixth element, proof an injury proximately caused by the reliance. The injury alleged by the Plaintiffs is that they did not receive a replacement motor home. However, the only way the Plaintiffs would have been entitled to a replacement is if their motor home were considered a "total loss," as a result of the accident. As the Court has previously determined, since no reasonable jury could find that the motor home was a "total loss," as that term is defined by the insurance contract, the Plaintiffs have failed to raise a genuine issue of material fact indicating that they were injured by reliance on the allegedly fraudulent statements of the Defendants. Therefore, the Defendants' Motions for Summary Judgment (Doc. # 80 (Bailey Mot. Summ. J.); Doc. # 81 (National Mot.

---

defendant on the plaintiff's bad faith claim, the court stated, "[g]iven the evidence that the vehicle was repairable and was, in fact, repaired, the failure of [the insurer] to 'total the vehicle does not, as a matter of law, approach [the plaintiff's] claim of bad faith by [the insurer] in dealing with her in that respect.'" *Id.* at 1988 WL 101229, *4, 1988 Ohio App. LEXIS 3855, *9.

**10.** In their Memorandum in Opposition, the Plaintiffs rephrase the alleged misrepresentations as follows: "that the Motor vehicle was repairable to like new condition and not totaled; that Philpot was unqualified as an appraiser; that Eastgate Ford would be a proper repair facility to make the vehicle 'like new' for $6700; and that Bailey had the Plaintiffs [sic] best interest at heart (he did not)." Doc. # 84 (Memo.Opp'n) at 12. The Plaintiffs did not seek leave to amend their Complaint. Such an amendment would not have been helpful, however, since the Plaintiffs still have not set forth evidence to create a genuine issue of material fact as to each of the elements of their fraud claim.

Summ. J.)) are SUSTAINED, as to Count Four.

### D. *Breach of the Ohio Consumer Sales Practices Act (Count Six)*

In Count Six of their Complaint, the Plaintiffs allege that the actions of National and Bailey "are tantamount to unfair and deceptive practices in violation of the Ohio Consumer Sales Practices Act, § 1345.01 *et seq.*, of the Ohio Revised Code." Doc. # 1 (Compl.) ¶ 57. The Ohio Consumer Sales Practices Act ("OCSPA") prohibits a person engaged in the business of effecting or soliciting consumer transactions from committing an unfair or deceptive act or practice in connection with those consumer transactions. Ohio Rev. Code Ann. §§ 1345.01(C), 1345.02(A). The term "consumer transaction" includes, among other things, sales, leases, assignments or services to individuals for purposes that are primarily personal, family, or household. Ohio Rev.Code Ann. § 1345.01(A). The term does not, however, include transactions between persons defined in § 5725.01. Ohio Rev.Code Ann. § 1345.01(A). One of the "persons" excepted out of the OCSPA by § 5725.01 is

an "insurance company," which is defined as "every corporation, association, and society engaged in the business of insurance of any character, or engaged in the business of entering into contracts substantially amounting to insurance of any character, or of indemnifying or guaranteeing against loss or damage, or acting as surety on bonds or undertakings." Ohio Rev. Code Ann. § 5725.01(C). It is undisputed that Defendant National is an insurance company, according to this definition.

■ Both National and Bailey contend that summary judgment is appropriate as the transaction in question deals with an insurance policy, and therefore the OCSPA does not apply. Doc. # 80 (Bailey Mot. Summ. J.) at 5–6; Doc. # 81 (National Mot. Summ. J.) at 18–20. Bailey further contends that he is entitled to summary judgment as he never engaged in a "consumer transaction" with the Plaintiffs. Doc. # 80 (Bailey Mot. Summ. J.) at 5. The Plaintiffs argue that Bailey can be held liable for violating the OCSPA as "he did an evaluation of the Motor Home for [them]," and that National can be held to account based on its derivative liability for the actions of Bailey, its agent.[11] Doc.

11. The Court does not reach the Plaintiffs' derivative liability argument, as to National, since it does not find that Bailey is liable under the OCSPA. Even if the Court had reached that argument, however, the two cases relied on by the Plaintiffs in support of their derivative liability argument are inapplicable.

In *Hardeman v. Wheels, Inc.,* 56 Ohio App.3d 142, 565 N.E.2d 849 (1988), the Warren County Appellate Court recognized that Chrysler Credit Corporation was the assignee of a contract originally entered into between the plaintiff and a car dealership, Wheels, Inc. *Id.* at 145, 565 N.E.2d 849. As the assignee of the contract, Chrysler Corporation was required to pay actual and statutory damages (but not punitive damages or attorney fees) that had been awarded against insolvent Wheels under both breach of contract and violation of OCSPA claims. *Id.* at 142–46,

565 N.E.2d 849. The court's holding, which determined that Chrysler was liable, was based on the theory that, as a holder of an assigned retail installment contract, Chrysler had notice pursuant to federal regulation that it would be subject to any claim or defense the debtor could assert against the original seller of the goods. *Id.* at 145, 565 N.E.2d 849. Since National, in the present case, was not a holder of an assigned retail installment contract, or contractually or otherwise obligated in any fashion as was Chrysler, the holding in *Hardeman* is inapposite. Furthermore, the OCSPA was irrelevant, as the issue was notice, by law, contract or otherwise of potential liability. That is what was absent in this case. The second case relied on by the Plaintiffs, *Provident Bank v. Barnhart,* 3 Ohio App.3d 316, 445 N.E.2d 746 (1982), is even less supportive of the Plaintiffs' claim. Like *Hardeman, Provident* also involved an assign-

# 84 (Memo.Opp'n) at 12–13. The Plaintiffs' arguments are unpersuasive in that they provide no support for their assertion that they participated in a "consumer transaction" with Bailey.

The Plaintiffs have offered nothing to suggest that Bailey was, at any time, acting on their behalf or providing a service for them. Rather, the evidence indicates that Bailey was acting as National's agent, given that National hired Bailey, National paid Bailey and that Bailey reported to National. The Plaintiffs specifically acknowledge this relationship. *E.g.*, Doc. # 72 (M. Schaller Dep.) Part B at 20.[12] The transaction occurred between the Plaintiffs and National, rather than between the Plaintiffs and Bailey, and such transactions with insurance companies are specifically exempted from the reach of the OCSPA.

Since the Plaintiffs have offered nothing that would allow a reasonable jury to conclude that Bailey engaged in a "consumer transaction" with the Plaintiffs, as that phrase is defined by the statute, Bailey is entitled to summary judgment on this issue. Further, as the OCSPA does not apply to insurance companies, National is entitled to summary judgment as a matter of law. Therefore, the Defendants' Motions for Summary Judgment (Doc. # 80 (Bailey Mot. Summ. J.); Doc. # 81 (National Mot. Summ. J.)) are SUSTAINED as to Count Six.

## E. *Negligent Hiring, Supervision and Retention (Count Eight)*

The Plaintiffs' final claim alleges that National was negligent in hiring, retaining and supervising Bailey. Doc. # 1 (Compl.) ¶ 61. Under Ohio law, to successfully plead such a claim, a plaintiff must establish:

(1) [T]he existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employer's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.

*Cooke v. Montgomery County*, 158 Ohio App.3d 139, 145, 814 N.E.2d 505 (2004). National argues that there is no evidence on the record to support the second or third elements of the Plaintiffs' claim. Doc. # 81 (National Mot. Summ. J.) at 21. The Plaintiffs fail to respond. *See* Doc. # 84 (Mem.Opp'n).

When moving for summary judgment, it is the responsibility of the moving party to point to that portion of the record which it believes indicates that there is no genuine issue of material fact. *Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir.1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to re-

---

ee of a retail installment contract. *Id.* Unlike *Hardeman*, the case had nothing to do with the OCSPA, however, making it completely irrelevant to the determination of the case presently before this Court.

**12.** As an example, in pertinent part, Mrs. Schaller's Deposition reads as follows:

Q: At the time of your [initial] conversation with Mr. Bailey, what was your understanding of who employed Mr. Bailey?
A: National Alliance Insurance Company.

Q: He was an employee of National Alliance?
A: I felt that he was, yes.
Q: And what did you base that opinion on?
A: Because Mr. McNiff sent for him.
Q: All right. You mean he hired him to do the appraisal?
A: Mr. McNiff knew him readily, so I figured that he was a National Alliance Person.

Doc. # 72 (M. Schaller Dep.) Part B at 20.

solve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.,* 61 F.3d 1241, 1245 (6 th Cir.1995). National has satisfied its burden by asserting that there is no evidence to support the second and third elements of the Plaintiffs' claim.[13] The Plaintiffs have, in response, failed to present evidence that creates a genuine issue of material fact. Consequently, National's Motion for Summary Judgment (Doc. # 81 (National Mot. Summ. J.)) is SUSTAINED as to Count Eight.

### F. *Conspiracy (Counts Two, Five and Seven)*

■ The Plaintiffs also allege conspiracy to act in bad faith (Doc. # 1 (Compl.) ¶¶ 37–40), conspiracy to commit fraud (*id.* ¶¶ 54–55) and conspiracy to commit violations of the Ohio Consumer Sales Practices Act (*id.* ¶¶ 58–59). Civil conspiracy in Ohio is "a malicious combination of two of more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998), *cert. denied, Aetna Fin. Co. v. Williams,* 526 U.S. 1051, 119 S.Ct. 1357, 143 L.Ed.2d 518 (1999). An underlying unlawful act is required before a civil conspiracy claim can be successful. *Id.*

As the Plaintiffs cannot maintain a claim for any of the underlying allegedly unlawful acts against either Defendant, their claims of conspiracy must also fail. Consequently, the Defendants' Motions for Summary Judgment (Doc. # 80 (Bailey Mot. Summ. J.); Doc. # 81 (National Mot. Summ. J.)) are SUSTAINED as to Counts Two, Five and Seven.

### IV. CONCLUSION

The Motions for Summary Judgment of the Defendant Bailey (Doc. # 80) and the Defendant National (Doc. # 81) are SUSTAINED as to all counts. Defendant National's Motion in Limine to Exclude certain Testimony of Mildred Schaller (Doc. # 90), Motion in Limine to Exclude the Testimony of Plaintiffs' Experts (Doc. # 91), Motion in Limine to Exclude Testimony of Steve Philpot (Doc. # 92), Motion to Compel Plaintiffs to Submit Joint Proposed Final Pretrial Order (Doc. # 93) and Motion for an Order Deeming Defendant's Request For Admissions to Plaintiffs Admitted (Doc. # 101) are OVERRULED, as moot. Plaintiffs' Motion in Limine to Exclude Information as to Fair Market Value of Motor Home and Information as to Subsequent Sales Price (Doc. # 98) and Motion to Supplement Admissions (Doc. # 112) are OVERRULED, as moot.

All rulings hereunder are made on the condition that Defendant National provide proper Rule 56 evidence regarding the Eastgate Ford damage analysis to the Court within ten (10) days of the date of this Order. Failing this, the Decision will be vacated. Should such evidence be presented, judgment will be ordered to enter in favor of Defendants and against Plaintiffs, terminating the captioned cause.

---

**13.** The Plaintiffs actually point to no evidence to support any element of this claim, completely disregarding it in their Memorandum in Opposition. *See* Doc. # 84.